1

IN THE MUNICIPAL COURT OF THE SAN DIEGO JUDICIAL DISTRICT

COUNTY OF SAN DIEGO, STATE OF CALIFORNIA

DEPARTMENT NO. 25        BEFORE HON. HOWARD H. SHORE, JUDGE

## ORIGINAL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, | ) | |
| | ) | |
| PLAINTIFF, | ) | PRELIMINARY EXAMINATION |
| V. | ) | NO. CR *138217* |
| | ) | |
| ALEJANDRO ISRAEL VILLA, | ) | F 155246    P 025178 |
| DEFENDANT. | ) | |

CR138217

### REPORTER'S TRANSCRIPT

SAN DIEGO, CALIFORNIA

MARCH 30, 1993

COUNSEL APPEARING:

FOR THE PLAINTIFF:        EDWIN L. MILLER, JR.
                          DISTRICT ATTORNEY
                          BY:  JOHN DAVIDSON
                          DEPUTY DISTRICT ATTORNEY


FOR THE DEFENDANT:        MICHAEL SIDEMAN
                          ATTORNEY AT LAW


REPORTED BY:              DONNA T. GEBHART, CSR 2372
                          MUNICIPAL COURT REPORTER
                          SAN DIEGO COUNTY COURTHOUSE
                          SAN DIEGO, CALIFORNIA 92101

2

## INDEX OF WITNESSES

| FOR THE PEOPLE: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| CASTRO, DANA | 4 | 16 | | |
| CHACON, CARLOS | 19 | 24 | | |
| CORROS, KENNETH | 23 | 49 | | |
| DAVIS, COLEY | 75 | 88 | | |
| MUSGROVE, MARK | 91 | | | |
| GONZALEZ, CARLOS | 96 | 110 | 116 | 117 |
| TRIVIZ, RANDAL | 117 | 121 | | |

## INDEX OF EXHIBITS

| FOR THE PEOPLE: | IDENTIFICATION | EVIDENCE |
|---|---|---|
| 1 - DIAGRAM | 7 | 125 |
| 2 - PHOTO OF POSTER BOARD | 8 | 125 |
| 3 - PHOTO, INDENTATION ON WALL | 9 | 125 |
| 4 - PHOTO, INDENTATION ON WALL | 9 | 125 |
| 5 - PHOTO OF MISSLE | 10 | 125 |
| 6 - DIAGRAM | 11 | 125 |
| 7 - PHOTO OF VICTIM | 12 | 125 |
| 8 - PHOTO OF MISSLE | 13 | 125 |
| 9 - PHOTO OF KNIFE | 14 | 125 |
| 10 - AUTOPSY REPORT | 124 | 125 |

3

SAN DIEGO, CALIFORNIA, MARCH 30, 1993, 9:45 A.M.


P R O C E E D I N G S


THE COURT:  GOOD MORNING.  LET'S CALL THE CASE, PLEASE.

THE CLERK:  PEOPLE VS. ALEJANDRO VILLA.

MR. DAVIDSON:  GOOD MORNING.  FOR THE PEOPLE, JOHN DAVIDSON, READY TO PROCEED.

MR. SIDEMAN:  YOUR HONOR, MICHAEL SIDEMAN FOR ALEJANDRO VILLA.  HE IS PRESENT.  WE'RE READY TO PROCEED.  I DO HAVE A MOTION TO EXCLUDE WITNESSES, YOUR HONOR.

THE COURT:  HOW MANY WITNESSES ARE THERE?

MR. DAVIDSON:  YOUR HONOR, ALTOGETHER, THERE ARE SIX WITNESSES.

THE COURT:  AND IS THERE AN INVESTIGATING OFFICER TO BE DESIGNATED?

MR. DAVIDSON:  SEATED TO MY LEFT, CHICO GONZALEZ. CARLOS GONZALEZ, FOR THE RECORD.

THE COURT:  PURSUANT TO PENAL CODE SECTION 867, THE DEFENSE MOTION TO EXCLUDE WITNESSES WILL BE GRANTED, AS REQUIRED BY LAW.  OFFICER GONZALEZ MAY REMAIN AS THE PEOPLE'S DESIGNATED INVESTIGATING OFFICER.

IS THERE A DEFENSE DESIGNATED INVESTIGATING OFFICER?

MR. SIDEMAN:  NO, YOUR HONOR.

THE COURT:  ALL RIGHT.  ALL WITNESSES WILL BE INSTRUCTED NOT TO DISCUSS THEIR TESTIMONY WITH EACH OTHER AT ANY TIME DURING THIS HEARING, EITHER BEFORE, DURING OR AFTER YOUR OWN

4

1    TESTIMONY.  AND WHO'S YOUR FIRST WITNESS.

2        MR. DAVIDSON:  MY FIRST WITNESS WILL BE DANA CASTRO.

3    SHE'S OUTSIDE, YOUR HONOR.

4        THE COURT:  MS. CASTRO MAY REMAIN IN THE COURTROOM TO BE

5    CALLED AS THE FIRST WITNESS.  AND ALL OTHER WITNESSES WILL GO

6    INTO THE HALLWAY AT THIS TIME.

7

8                    DANA CASTRO

9        CALLED AS A WITNESS BY AND ON BEHALF OF THE PEOPLE,

10       HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

11

12                  DIRECT EXAMINATION

13   BY MR. DAVIDSON:

14       Q.    GOOD MORNING.  IF YOU WOULD, PLEASE STATE YOUR FULL

15   NAME AND SPELL YOUR LAST NAME FOR THE RECORD.

16       A.    DANA CASTRO, C-A-S-T-R-O.

17       Q.    AND MS. CASTRO, WHAT IS YOUR OCCUPATION?

18       A.    I'M THE PROPERTY EVIDENCE TECHNICIAN AT NATIONAL

19   CITY POLICE DEPARTMENT.

20       Q.    AND HOW LONG HAVE YOU BEEN EMPLOYED IN THAT

21   CAPACITY?

22       A.    FOUR AND A HALF YEARS.

23       Q.    AND DO YOU ALSO AS PART OF YOUR OCCUPATION

24   PARTICIPATE IN EVIDENCE COLLECTION AT CRIME SCENES?

25       A.    YES.

26       Q.    AND WHAT IS YOUR DUTIES AND ROLES IN THAT RESPECT?

27       A.    I'M ON CALL AND RESPOND TO HOMICIDE CASES OR MAJOR

28   CASES THAT OCCUR IN NATIONAL CITY.  I ROLL OUT TO THE SCENES AND

5

1    COLLECT, PROCESS AND COLLECT EVIDENCE AT THE SCENE.

2        Q.    AND HOW LONG HAVE YOU BEEN DOING THAT?

3        A.    FOUR AND A HALF YEARS.

4        Q.    AND SPECIFICALLY, I'D LIKE TO REFER YOU TO THE DATE

5    OF FEBRUARY 28TH, 1993, DURING THE EVENING HOURS, DID YOU GO TO

6    THE AREA OF WHAT IS KNOWN AS PLAZA BONITA MALL, LOCATED AT 3030

7    PLAZA BONITA BOULEVARD, IN THE CITY OF NATIONAL CITY?

8        A.    YES.

9        THE COURT:  HOLD ON ONE SECOND.

10                    IS THERE MORE EQUIPMENT THAT HAS TO BE SET

11   UP?

12       SPECTATOR:  IF WE COULD.  WE'RE CHANNEL 39.

13       THE COURT:  ALL RIGHT.  LET'S PAUSE FOR A MOMENT, MR.

14   DAVIDSON.

15                    GO AHEAD.  THIS IS ALL SUBJECT TO THE SAME

16   AGREEMENT.

17       SPECTATOR:  YES.

18       THE COURT:  ALL RIGHT.  ALL SET.

19       SPECTATOR:  THANK YOU VERY MUCH.

20       THE COURT:  BACK ON THE RECORD.  COULD YOU PLEASE READ

21   BACK THE LAST QUESTION AND ANSWER.

22                    (RECORD READ)

23       THE COURT:  ALL RIGHT.  MR. DAVIDSON.

24   BY MR. DAVIDSON:

25       Q.    THANK YOU.  IS THAT ALSO IN THE COUNTY OF SAN

26   DIEGO?

27       A.    YES, IT IS.

28       Q.    AND APPROXIMATELY WHAT TIME DID YOU ARRIVE AT PLAZA

6

BONITA MALL?

A.      APPROXIMATELY 7:30 THAT EVENING.

Q.      AND WAS THAT IN RESPONSE TO A PHONE CALL OR SOME REQUEST YOU'D RECEIVED?

A.      YES.

Q.      AND WHAT WAS THE NATURE OF THAT CALL THAT YOU HAD RECEIVED?

A.      THAT THERE HAD BEEN A SHOOTING AT PLAZA BONITA AND THAT THEY WANTED ME TO COME IN TO PROCESS THE SCENE.

Q.      AND DID YOU IN FACT GO TO THAT LOCATION?

A.      YES.

Q.      AND DID YOU ASSIST ANOTHER DETECTIVE IN COLLECTING EVIDENCE AT THE PLAZA BONITA MALL?

A.      YES.

Q.      AND WHAT DETECTIVE WAS THAT?

A.      DETECTIVE JAMES DUNN.

Q.      AND SPECIFICALLY DID YOU GO TO AN AREA INSIDE THE PLAZA BONITA MALL, A STORE KNOWN AS CLAIRE'S BOUTIQUES?

A.      YES.

Q.      AND WHAT, IF ANYTHING, DID YOU FIND ONCE YOU ARRIVED AT CLAIRE'S BOUTIQUES?

A.      THERE WAS A BODY, MALE HISPANIC, ON THE FLOOR, AND VARIOUS EVIDENCE SURROUNDING.

MR. DAVIDSON:  YOUR HONOR, I HAVE A DIAGRAM I WOULD LIKE TO HAVE MARKED AS PEOPLE'S 1 FOR IDENTIFICATION.

THE COURT:  VERY WELL.  PEOPLE'S EXHIBIT 1 FOR IDENTIFICATION.

7

(WHEREUPON, THE EXHIBIT REFERRED
TO IS MARKED PEOPLE'S EXHIBIT 1
FOR IDENTIFICATION.)

BY MR. DAVIDSON:

Q.    MS. CASTRO, I WOULD LIKE TO SHOW YOU A DIAGRAM
THAT'S BEEN MARKED AS PEOPLE'S 1 FOR IDENTIFICATION, AND ASK
YOU, DO YOU RECOGNIZE WHAT'S WRITTEN ON THAT DIAGRAM?

A.    YES.

Q.    AND WHAT DOES THAT DIAGRAM PURPORT TO BE OF?

A.    THIS IS AN OVERALL VIEW OF THE PLAZA BONITA AREA
WHICH WE WERE AT.

Q.    AND IS THAT -- DOES THE AREA DEPICTED ON THE
DIAGRAM SHOW THE STORE WHERE YOU FOUND THE BODY AT, CLAIRE'S
BOUTIQUES?

A.    YES.

Q.    AND IF YOU WOULD, FOR THE COURT, COULD YOU JUST
DESCRIBE THE AREA OF THE PLAZA BONITA MALL WHERE CLAIRE'S
BOUTIQUES IS LOCATED?

A.    CLAIRE'S BOTIQUE IS ON THE NORTHEAST SIDE OF THE
MALL.

Q.    DOES THE MALL CONSIST OF TWO LEVELS?

A.    YES.

Q.    AND IS THERE SOME TYPE OF STAIRS OR OTHER MEANS OF
TRANSPORTATION FOR A PERSON TO GO FROM THE LOWER LEVEL TO THE
UPPER LEVEL?

A.    THE NEAREST THING IS AN ESCALATOR.

Q.    AND IS THAT LOCATED IN THE AREA NEAR BY CLAIRE'S
BOUTIQUES?

A.    STRAIGHT ACROSS FROM IT.

8

Q.    AND IS THERE ALSO AN AREA NEAR BY THE STORE, WHAT
APPEARS TO BE A BRIDGE ON THE UPPER LEVEL THAT CONNECTS THE TWO
SIDES OF THE MALL?

A.    YES.

Q.    NOW, ON THE DIAGRAM THAT I GAVE YOU, IS THERE A
NUMBER MARKED 15 ON THAT DIAGRAM?

A.    YES, THERE IS.

Q.    DO YOU KNOW WHAT THAT PURPORTS TO REPRESENT?

A.    YES.

Q.    AND WHAT IS THAT?

A.    THAT WAS A POSTER BOARD THAT WAS IN A POSTER
HOLDER.

Q.    AND DID YOU COLLECT SOME TYPE OF EVIDENCE FOR THAT
PARTICULAR -- FROM THAT PARTICULAR POSTER BOARD?

A.    ACTUALLY I COLLECTED THE ENTIRE POSTER BOARD
ITSELF.

Q.    AND WHAT, IF ANYTHING, DID YOU FIND ON THE POSTER
BOARD?

A.    THERE WAS A HOLE IN ABOUT MID BOTTOM OF THE POSTER.

Q.    ALL RIGHT.

MR. DAVIDSON:   I HAVE A PHOTOGRAPH THAT I WOULD LIKE TO
HAVE MARKED AS PEOPLE'S 2.

THE COURT:   PEOPLE'S 2.

(WHEREUPON, THE EXHIBIT REFERRED
TO IS MARKED PEOPLE'S EXHIBIT 2
FOR IDENTIFICATION.)

BY MR. DAVIDSON:

Q.    MS. CASTRO, SHOWING YOU A PHOTOGRAPH THAT'S BEEN
MARKED AS PEOPLE'S EXHIBIT 2 FOR IDENTIFICATION, DO YOU

1    RECOGNIZE WHAT'S DEPICTED ON THAT PHOTOGRAPH?

2        A.    YES.

3        Q.    AND WHAT IS DEPICTED ON THE PHOTOGRAPH?

4        A.    THIS IS THE POSTER BOARD IN THE POSTER HOLDER THAT

5    I COLLECTED.

6        Q.    AND IS THERE A HOLE IN THAT POSTER BOARD THAT'S

7    SHOWN IN THE PHOTOGRAPH?

8        A.    YES.

9        Q.    REFERRING YOU AGAIN TO THE DIAGRAM MARKED PEOPLE'S

10   1 FOR IDENTIFICATION, IS THE NUMBER 16 IN THE CIRCLE IN THAT

11   DIAGRAM?

12       A.    YES.

13       Q.    WHAT DOES THAT NUMBER 16 REPRESENT?

14       A.    NUMBER 16 IS AN INDENTATION IN THE WALL OF THE

15   ROBINSON MAY STORE.

16       MR. DAVIDSON:   YOUR HONOR, I HAVE ANOTHER PHOTOGRAPH I

17   WOULD ASK TO BE MARKED AS PEOPLE'S 3 AND 4 FOR IDENTIFICATION,

18   TWO SEPARATE PHOTOGRAPHS.

19                          (WHEREUPON, THE EXHIBITS REFERRED
20                           TO ARE MARKED PEOPLE'S EXHIBIT 3&4
                             FOR IDENTIFICATION.)
21   BY MR. DAVIDSON:

22       Q.    MS. CASTRO, SHOWING YOU WHAT'S BEEN MARKED AS

23   PEOPLE'S EXHIBIT NO. 3 FOR IDENTIFICATION, DO YOU RECOGNIZE

24   WHAT'S DEPICTED ON THAT PHOTOGRAPH?

25       A.    YES.

26       Q.    AND WHAT IS THAT?

27       A.    THIS IS THE INDENTATION IN THE WALL OF THE ROBINSON

28   MAY STORE.

10

    1      Q.   SHOWING YOU PEOPLE'S EXHIBIT NO. 4 FOR

    2  IDENTIFICATION, DO YOU RECOGNIZE THAT PHOTOGRAPH, WHAT'S

    3  DEPICTED ON IT?

    4      A.   YES, I DO.  IT, TOO, IS THE PICTURE OF THE

    5  INDENTATION ON THE WALL OF ROBINSON MAY STORE.

    6      Q.   AND THAT WOULD CORRELATE WITH NUMBER 16 ON PEOPLE'S

    7  EXHIBIT NO. 1 FOR IDENTIFICATION?

    8      A.   CORRECT.

    9      Q.   REFERRING YOU AGAIN TO PEOPLE'S EXHIBIT NO. 1 FOR

  10  IDENTIFICATION, IS THE NO. 17 MARKED ON THAT DIAGRAM WITH A

  11  CIRCLE?

  12      A.   PARDON?

  13      Q.   IS THE NO. 17 MARKED ON THAT DIAGRAM WITH A CIRCLE?

  14      A.   YES, IT IS.

  15      Q.   AND WHAT DOES NO. 17 PURPORT TO REPRESENT ON THE

  16  DIAGRAM?

  17      A.   17 IS A MISSILE THAT WAS LOCATED NEXT TO A LARGE

  18  PLANT CONTAINER.

  19      MR. DAVIDSON:  YOUR HONOR, I HAVE A PHOTOGRAPH I WOULD

  20  LIKE TO HAVE MARKED AS PEOPLE'S 5.

  21                  (WHEREUPON, THE PHOTO REFERRED

                         TO IS MARKED PEOPLE'S EXHIBIT 5

  22                   FOR IDENTIFICATION.)

  23

  24  BY MR. DAVIDSON:

  25      Q.   MS. CASTRO, I WOULD LIKE TO SHOW YOU WHAT'S BEEN

  26  MARKED AS PEOPLE'S EXHIBIT NO. 5 FOR IDENTIFICATION, A

  27  PHOTOGRAPH, AND ASK IF YOU RECOGNIZE WHAT'S DEPICTED ON THAT

  28  PHOTOGRAPH?

1    A.    YES, I DO.

2    Q.    AND WHAT IS DEPICTED ON THE PHOTOGRAPH?

3    A.    IT IS A MISSILE THAT WAS LOCATED NEXT TO A LARGE

4  PLANT CONTAINER.

5    Q.    AND WITH RESPECT TO BOTH THE ITEMS MARKED 16 AND 17

6  ON THE DIAGRAM, WOULD THAT BE IN THE NORTH, FARTHEST NORTH AREA

7  OF THE PLAZA BONITA MALL?

8    A.    YES.

9    Q.    AND IS THERE AN EXIT/ENTRY DOOR NEARBY THAT AREA?

10    A.    YES.

11    Q.    AND WHERE IS THAT LOCATED?

12    A.    IT'S JUST DIRECTLY TO THE WEST.

13    Q.    NOW, DID YOU ALSO GO INSIDE TO CLAIRE'S BOUTIQUES

14  AND COLLECT EVIDENCE?

15    A.    YES, I DID.

16    MR. DAVIDSON:  YOUR HONOR, I HAVE A DIAGRAM I WOULD ASK

17  TO BE MARKED AS PEOPLE'S 6 FOR IDENTIFICATION.

18                    (WHEREUPON, THE EXHIBIT REFERRED
                      TO IS MARKED PEOPLE'S EXHIBIT 5
                      FOR IDENTIFICATION.)

19

20

21  BY MR. DAVIDSON:

22    Q.    MS. CASTRO, I WOULD LIKE TO SHOW YOU WHAT HAS BEEN

23  MARKED AS PEOPLE'S EXHIBIT NO. 6 FOR IDENTIFICATION, AND ASK YOU

24  IF YOU RECOGNIZE WHAT'S DEPICTED ON THAT DIAGRAM?

25    A.    YES.

26    Q.    AND WHAT DOES THAT DIAGRAM PURPORT TO REPRESENT?

27    A.    THIS DIAGRAM IS OF THE INSIDE OF CLAIRE'S BOUTIQUES

28  STORE.

12

Q.    AND IS THERE ALSO A BODY DEPICTED ON THAT PHOTOGRAPH?

A.    YES, THERE IS.

Q.    AND WHEN YOU ARRIVED AT CLAIRE'S BOTIQUE, WAS -- DID YOU FIND THE POSITION OF THE BODY TO BE THE SAME AS DEPICTED ON THE PHOTOGRAPH MARKED PEOPLE'S 6 FOR IDENTIFICATION?

A.    YES.

MR. DAVIDSON:   YOUR HONOR, I HAVE ANOTHER PHOTOGRAPH I WOULD LIKE TO HAVE MARKED AS PEOPLE'S 7 FOR IDENTIFICATION.

(WHEREUPON, THE PHOTO REFERRED
TO IS MARKED PEOPLE'S EXHIBIT 7
FOR IDENTIFICATION.)

BY MR. DAVIDSON:

Q.    LIKE TO SHOW YOU WHAT'S BEEN MARKED AS PEOPLE'S EXHIBIT NO. 7 FOR IDENTIFICATION, AND ASK YOU, DO YOU RECOGNIZE WHAT'S DEPICTED ON THAT PHOTOGRAPH?

A.    YES, I DO.

Q.    AND WHAT EXACTLY IS DEPICTED ON THE PHOTOGRAPH?

A.    IT IS A PICTURE OF THE VICTIM THAT WAS IN THE CLAIRE'S BOTIQUE STORE.

Q.    AND SPECIFICALLY WHEN YOU WENT IN TO COLLECT EVIDENCE, DID YOU EXAMINE THE INDIVIDUAL'S BODY THAT WAS INSIDE CLAIRE'S BOTIQUE FOR THE PRESENCE OF ANY TYPE OF WOUNDS?

A.    YES.

Q.    AND SPECIFICALLY WAS THERE A MISSILE OF SOME TYPE CONSISTENT WITH A BULLET MISSILE FOUND INSIDE OF CLAIRE'S BOTIQUE?

A.    YES, THERE WAS.

Q.    AND WHERE WAS THAT FOUND IN RELATIONSHIP TO THE

DONNA T. GEBHART, OFFICIAL COURT REPORTER

13

| | |
|---|---|
| 1 | BODY INSIDE OF CLAIRE'S BOTIQUE? |
| 2 | A.   IT WAS JUST TO THE LEFT OF THE BODY, JUST NEAR |
| 3 | WHERE THE HANDS WERE AT HIS LEFT HAND. |
| 4 | Q.   IS THERE A PARTICULAR NUMBER ON THE DIAGRAM MARKED |
| 5 | PEOPLE'S 6 TO INDICATE WHERE THE MISSILE WAS LOCATED? |
| 6 | A.   YES, THERE IS. |
| 7 | Q.   AND WHAT NUMBER IS THAT? |
| 8 | A.   ITEM 6. |
| 9 | MR. DAVIDSON:   YOUR HONOR, I HAVE ANOTHER PHOTOGRAPH I |
| 10 | WOULD LIKE TO HAVE MARKED NEXT IN ORDER. |
| 11 | THE COURT:   PEOPLE'S 8. |
| 12 | (WHEREUPON, THE PHOTO REFERRED |
| 13 | TO IS MARKED PEOPLE'S EXHIBIT 8 FOR IDENTIFICATION.) |
| 14 | |
| 15 | BY MR. DAVIDSON: |
| 16 | Q.   MS. CASTRO, I WOULD LIKE TO SHOW YOU WHAT'S BEEN |
| 17 | MARKED AS PEOPLE'S EXHIBIT NO. 8 FOR IDENTIFICATION, AND ASK |
| 18 | YOU, DO YOU RECOGNIZE WHAT'S DEPICTED ON THAT PHOTOGRAPH? |
| 19 | A.   YES. |
| 20 | Q.   AND WHAT IS DEPICTED ON THE PHOTOGRAPH? |
| 21 | A.   THIS IS A PICTURE OF THE MISSILE. |
| 22 | Q.   MS. CASTRO, WHILE YOU WERE EXAMINING THE EVIDENCE |
| 23 | AT THE SCENE, AT SOME POINT DID YOU FIND A BUCK KNIFE LOCATED |
| 24 | THERE? |
| 25 | A.   YES. |
| 26 | Q.   AND WHERE IN RELATIONSHIP TO THE BODY FOUND AT |
| 27 | CLAIRE'S BOTIQUE WAS THE BUCK KNIFE LOCATED? |
| 28 | A.   THE BUCK KNIFE WAS FOUND ON THE CASHIER'S COUNTER. |

14

Q.    AND WAS THAT NOTED AS A PARTICULAR EVIDENCE NUMBER?

A.    YES, IT WAS.

Q.    WHAT NUMBER IS THAT?

A.    IT WAS ITEM 13.

Q.    IS ITEM 13 ON THE DIAGRAM MARKED PEOPLE'S EXHIBIT 6
FOR IDENTIFICATION?

A.    YES, IT IS.

                    (WHEREUPON, THE PHOTO REFERRED
                    TO IS MARKED PEOPLE'S EXHIBIT 9
                    FOR IDENTIFICATION.)


MR. DAVIDSON:   ANOTHER PHOTOGRAPH, YOUR HONOR, I WOULD
ASK TO BE MARKED AS PEOPLE'S EXHIBIT 9.

BY MR. DAVIDSON:

Q.    MS. CASTRO, I LIKE TO SHOW YOU WHAT'S BEEN MARKED
AS PEOPLE'S EXHIBIT NO. 9 FOR IDENTIFICATION, AND ASK IF YOU
RECOGNIZE WHAT'S DEPICTED IN THAT PHOTOGRAPH?

A.    YES.  I RECOGNIZE IT TO BE THE KNIFE THAT WAS ON
THE CASHIER'S COUNTER.

Q.    NOW, MS. CASTRO, IF YOU WOULD, I WOULD ASK YOU TO
PLEASE GET PEOPLE'S EXHIBIT NO. 1 AGAIN, THE DIAGRAM.  AND IF
YOU WOULD, SPECIFICALLY ON THE DIAGRAM, I'D REFER YOU TO WHERE
CLAIRE'S BOUTIQUES IS LOCATED, IS THERE A STORE TO THE SOUTH OF
CLAIRE'S BOTIQUE AS DEPICTED ON THE DIAGRAM?

A.    YES.

Q.    AND WHAT STORE IS THAT?

A.    KID KORRAL.

Q.    IS THERE ANOTHER STORE SOUTH OF THE KIDS KORRAL AS
DEPICTED ON THE PHOTOGRAPH?

15

A.    YES.

Q.    ON THE DIAGRAM, EXCUSE ME.

A.    YES.

Q.    WHAT STORE IS THAT?

A.    FOOTACTION USA.

Q.    AND IS THERE ALSO ANOTHER STORE TO THE SOUTH OF FOOTACTION USA?

A.    YES.

Q.    WHAT STORE IS THAT?

A.    GARDEN BOTANIKA.

Q.    AND I WOULD REFER YOU TO THE DIAGRAM. DO YOU SEE THE WORDS ON THE DIAGRAM "LOWER LEVEL FLOOR"?

A.    YES.

Q.    AND THERE APPEARS TO BE A SQUARE AREA ABOVE THOSE WORDS; IS THAT CORRECT?

A.    I'M SORRY?

Q.    THERE APPEARS TO BE WHAT APPEARS TO BE SOME STRAIGHT LINES DRAWN ABOVE THE WORDS "LOWER LEVEL FLOOR," IS THAT CORRECT, SURROUNDING IT?

A.    YES, THAT'S CORRECT.

Q.    AND WOULD THOSE LINES PURPORT TO BE THE RAILINGS ON THE UPPER LEVEL OF THE MALL?

A.    YES, THEY ARE.

Q.    AND ARE YOU AWARE OF OR CAN YOU GIVE US APPROXIMATE DISTANCE OF THE RAILING AS DEPICTED IN THAT AREA OF THE DIAGRAM TO THE STORE KNOWN AS THE GARDEN BOTANIKA AS DEPICTED ON THE DIAGRAM?

A.    NO, I'M SORRY.

16

Q.    ON THE AREA LOCATED ON THE DIAGRAM MARKED PEOPLE'S
EXHIBIT NO. 1 FOR IDENTIFICATION, IS THERE AN AREA SHOWN TO BE
KAY-BEE TOY STORE?

A.    YES.

Q.    AND IS THERE AN INDICATION OF ANOTHER STORE KNOWN
AS DALTON BOOKS?

A.    YES.

Q.    AND AS DEPICTED ON THE DIAGRAM IT SAYS "DALTON
BOOKSELLER;" IS THAT CORRECT?

A.    YES, THAT'S CORRECT.

Q.    ARE THOSE STORES SIDE-BY-SIDE?

A.    YES, THEY ARE.

Q.    WOULD THEY BE ON THE EAST SIDE OF THE MALL, BOTH
KAY-BEE TOYS AND DALTON BOOKS?

A.    YES.

Q.    AND WOULD KAY-BEE TOYS BE DIRECTLY ACROSS OR
DIRECTLY IN LINE WITH THE LAST STORE LISTED UNDER FOOTACTION,
THAT BEING THE GARDEN, I'LL SPELL THE LAST NAME B-O-T-A-N-I-K-A?

A.    YES.

MR. DAVIDSON:  I HAVE NO FURTHER QUESTIONS OF THIS
WITNESS, YOUR HONOR.

THE COURT:  CROSS-EXAMINATION.

MR. SIDEMAN:  YES, THANK YOU.


CROSS-EXAMINATION

BY MR. SIDEMAN:

Q.    THIS DIAGRAM IS NOT TO SCALE, IS IT?

A.    NO, SIR.

17

Q.    EXCUSE ME, THE ONE OF THE UPPER LEVEL OF THE STORE?

THE COURT:  WHICH EXHIBIT NUMBER ARE YOU REFERRING TO?

MR. SIDEMAN:  MAY I APPROACH THE WITNESS?

THE COURT:  YES.  EITHER PEOPLE'S 1 OR PEOPLE'S 6.

MR. SIDEMAN:  PROBABLY PEOPLE'S 1.

BY MR. SIDEMAN:

Q.    YES, PEOPLE'S 1, IS THAT TO SCALE, MA'AM?

A.    NO, NOT TO MY KNOWLEDGE.

Q.    I'M REFERRING AGAIN TO PEOPLE'S 1, I BELIEVE YOU SAID THAT ITEM 15 WAS A SIGN, AND THAT'S DEPICTED IN THE PHOTOGRAPH, PEOPLE'S 2, IS THAT CORRECT, THAT WAS THE SIGN THAT WAS LOCATED NEAR RITZ CAMERA?

A.    THAT'S CORRECT.

Q.    AND YOU YOURSELF FOUND THE SIGN THERE IN THAT LOCATION?

A.    YES, THE SIGN WAS IN THAT LOCATION.

Q.    WAS THERE ANY INDICATION THAT IT HAD BEEN MOVED PRIOR TO YOUR COMING UPON THE SIGN?

A.    WHEN WE ARRIVED AT THE SCENE, ONE OF THE POLICE OFFICERS HAD TOLD US THAT IT HAD BEEN MOVED, BUT WHEN WE ARRIVED AT THE SCENE, THAT'S THE LOCATION THAT WE FOUND IT AT.

Q.    AND YOU HAVE NO IDEA WHAT THE ORIGINAL LOCATION WAS?

A.    NO.

Q.    THE SIGN READS "NATIONAL HEALTH AND NUTRITION," AND THEN THERE'S AN ARROW HAIRCUT PLACE, DO YOU KNOW, AND REFERRING AGAIN TO PEOPLE'S 1, THAT DIAGRAM ON THE SECOND FLOOR OF THE MALL, DO YOU KNOW IF THERE ARE ANY STORES BY THE NAME NATIONAL

1  HEALTH AND NUTRITION OR HAIRCUT PLACE--

2        A.    NO.

3        Q.    --ADJACENT TO RITZ CAMERA, OR ANYWHERE IN THAT

4  DIAGRAM?

5        A.    NO, NOT TO MY KNOWLEDGE.

6        Q.    OKAY.  AND REFERRING TO THE PEOPLE'S 6, THE DIAGRAM

7  OF CLAIRE'S BOTIQUE, YOU SAID THAT A KNIFE WAS FOUND ON THE

8  CASHIER'S COUNTER?

9        A.    YES, THAT'S CORRECT.

10        Q.    AND THAT WAS REFERENCE NO. 13, THE POCKET KNIFE?

11        A.    YES, THAT'S CORRECT.

12        Q.    DID YOU HAVE ANY INDICATION WHERE THAT KNIFE CAME

13  FROM OR HOW IT GOT ON THE COUNTER?

14        MR. DAVIDSON:  OBJECTION, CALLING FOR HEARSAY.

15        THE COURT:  WELL, THE QUESTION ASKED CALLS FOR A "YES" OR

16  "NO" ANSWER.  I'LL OVERRULE IT.  YOU MAY ANSWER "YES" OR "NO".

17        THE WITNESS:  CAN YOU REPEAT YOUR QUESTION, PLEASE?

18  BY MR. SIDEMAN:

19        Q.    DID YOU HAVE ANY, AT THE TIME THAT YOU LOCATED THAT

20  KNIFE, DID YOU HAVE ANY IDEA WHERE THE KNIFE HAD COME FROM, IF

21  IT HAD BEEN IN A PRIOR LOCATION PRIOR TO GETTING ON THE COUNTER?

22        A.    NO.

23        MR. SIDEMAN:  NO FURTHER QUESTIONS.

24        THE COURT:  ANY REDIRECT?

25        MR. DAVIDSON:  NO REDIRECT.

26        THE COURT:  ANY OBJECTION FROM THE DEFENSE TO THE WITNESS

27  BEING EXCUSED?

28        MR. SIDEMAN:  NO, YOUR HONOR.

THE COURT:  FROM THE PEOPLE?

MR. DAVIDSON:  NO, YOUR HONOR.

THE COURT:  MS. CASTRO, THANK YOU FOR COMING AND TESTIFYING.  YOU ARE EXCUSED AT THIS TIME.  YOU MAY CALL YOUR NEXT WITNESS.

MR. DAVIDSON:  YES, YOUR HONOR, AT THIS TIME I CALL CARLOS CHACON, C-H-A-C-O-N, TO THE STAND.


CARLOS CHACON

CALLED AS A WITNESS BY AND ON BEHALF OF THE PEOPLE,

HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:


DIRECT EXAMINATION

BY MR. DAVIDSON:

Q.   SIR, IF YOU WOULD, PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST NAME FOR THE RECORD.

A.   CARLOS CHACON, C-H-A-C-O-N.

Q.   WHAT IS YOUR OCCUPATION?

A.   I'M A POLICE SERGEANT FOR THE SAN DIEGO POLICE DEPARTMENT, CITY OF SAN DIEGO.

Q.   AND HOW LONG HAVE YOU BEEN EMPLOYED AS A POLICE OFFICER?

A.   GOING ON EIGHTEEN YEARS.

Q.   AND, SIR, I LIKE TO DIRECT YOUR ATTENTION TO THE DATE OF FEBRUARY 28TH, 1993, DURING THE AFTERNOON HOURS, DO YOU RECALL WHETHER OR NOT YOU WERE AT PLAZA BONITA MALL ON THAT DAY?

A.   YES, I WAS.

Q.   APPROXIMATELY WHAT TIME HAD YOU ARRIVED AT THE MALL

20

THAT DAY?

A.     ABOUT FOURTEEN HUNDRED HOURS, 2 O'CLOCK IN THE
AFTERNOON.

Q.     AND WERE YOU ON DUTY IN YOUR CAPACITY AS A POLICE
OFFICER AT THAT TIME?

A.     NO, I WASN'T.   I WAS OFF DUTY.

Q.     WHAT WAS YOUR PURPOSE IN BEING AT THE MALL AT THAT
TIME?

A.     SHOPPING AND MOVIES.

Q.     AND WHILE YOU WERE AT THE MALL, DO YOU RECALL
HEARING SOME TYPE OF UNUSUAL SOUNDS WHILE YOU WERE THERE OFF
DUTY?

A.     YES, WHILE I WAS IN THE GENERAL VICINITY OF THE
THEATERS, LOCATED IN THE MALL, I HEARD WHAT SOUNDED LIKE
GUNSHOTS COMING FROM THE NORTH END OF THE MALL.

Q.     AND WHEN YOU HEARD THE GUNSHOTS, WHAT, IF ANYTHING,
DID YOU DO?

A.     I BEGAN RUNNING IN THAT DIRECTION.

Q.     AND WHERE EXACTLY DID YOU GO?

A.     I WAS IN THE DOWNSTAIRS PORTION OF THE MALL, I RAN
NORTHBOUND TO, ALMOST TO THE VERY END, TO THE VERY LAST
ESCALATOR.   I WENT UP THE ESCALATOR, PEOPLE WERE POINTING IN
THAT DIRECTION.   AS I REACHED THE TOP OF THE ESCALATOR I LOOKED
ACROSS TO THE EAST SIDE OF THE WALKWAY, AND I COULD SEE THAT
THERE WAS A PERSON LAYING FACE DOWN, I BELIEVE IT WAS CLAIRE'S
BOTIQUE.

Q.     AND THAT'S A STORE INSIDE THE MALL?

A.     YES, IT IS.

1      Q.    DID YOU IN FACT GO TO CLAIRE'S BOTIQUE AT THAT

2  TIME?

3      A.    I WORKED MY WAY TO WHERE THE PERSON WAS LAYING

4  DOWN, YES.

5      Q.    AND COULD YOU, ONCE YOU ARRIVED THERE, COULD YOU

6  DESCRIBE WHAT AT CLAIRE'S BOTIQUE, WHAT THE SCENE WAS LIKE AT

7  THAT PARTICULAR POINT?

8      A.    EVERYBODY WAS FRANTIC.  THE SHOPPERS, THE PEOPLE

9  THAT HAD THEIR DISPLAYS, THEY WERE RUNNING AWAY FROM THAT

10  GENERAL AREA.  AS I WALKED UP THERE WERE SOME PEOPLE IN -- VERY

11  FEW PEOPLE INSIDE CLAIRE'S BOTIQUE.  THERE WAS A FEMALE SECURITY

12  OFFICER THERE AS WELL.  WHEN I WALKED IN I BELIEVE AN EMPLOYEE

13  WAS THERE AND THERE WAS SOME OTHER PEOPLE IN THE BACK THAT WERE

14  HIDING.

15      Q.    WAS YOUR ATTENTION DRAWN TO A YOUNG HISPANIC MALE

16  WHO WAS ON THE FLOOR OF CLAIRE'S BOTIQUE?

17      A.    YES.

18      Q.    AND COULD YOU DESCRIBE THE POSITION OF THE PERSON

19  THAT YOU SAW?

20      A.    HE WAS LAYING FACE DOWN, HIS LEGS FULLY EXTENDED.

21  HIS FEET WERE TO THE DOOR AND HIS HEAD WAS TOWARDS THE INSIDE OF

22  THE BUSINESS.

23      Q.    AND DID YOU DO ANYTHING AT THE TIME YOU ARRIVED

24  THERE?

25      A.    WELL, I SAW THAT HE HAD TWO BLOOD SPOTS ON HIS

26  BACK, AND I HAVING HEARD THE GUNSHOTS, I ASSUMED THEY WERE

27  GUNSHOT WOUNDS.

28      Q.    HOW MANY GUNSHOTS DID YOU HEAR TOTAL UP TO THAT

1   POINT, SERGEANT?

2      A.   I BELIEVE I HEARD AT LEAST FOUR, AND NOT IN RAPID

3   SUCCESSION.

4      Q.   AND IF YOU WOULD DESCRIBE HOW YOU HEARD THOSE FOUR

5   SHOTS?

6      A.   IT WAS LIKE BANG PAUSE BANG BANG, AND THEN I THINK

7   ANOTHER ONE LATER.

8      Q.   HOW MUCH TIME WENT BY AFTER YOU HEARD THE LAST

9   GUNSHOT UNTIL YOU ARRIVED AT CLAIRE'S BOTIQUE AND FOUND THE

10   INDIVIDUAL LAYING ON THE FLOOR?

11      A.   30 TO 45 SECONDS TOPS.

12      Q.   DID YOU RENDER ANY ASSISTANCE TO THE PERSON WHO WAS

13   LAYING ON THE FLOOR?

14      A.   YES, I ATTEMPTED TO ASCERTAIN THE EXTENT OF THE

15   INJURIES.  THE YOUNG MALE WASN'T MOVING, SO I STARTED TO RIP OFF

16   HIS CLOTHES.

17      Q.   AND DID YOU UTILIZE ANY TYPE OF INSTRUMENTS IN

18   RIPPING OFF HIS CLOTHES?

19      A.   WELL, WHEN I GOT TO THE SEAM PORTION -- THE

20   CLOTHING TORE FAIRLY EASILY, BUT WHEN I GOT TO THE SEAMS, THE

21   HEAVY REINFORCED SEAMS, I COULDN'T CUT THEM, SO I CALLED OUT TO

22   SEE IF ANYBODY HAD SCISSORS OR A KNIFE.

23      Q.   AND AT SOME POINT DID SOMEONE HAND YOU SOMETHING?

24      A.   THE FEMALE SECURITY OFFICER HANDED ME WHAT APPEARED

25   TO BE A BUCK KNIFE.

26      Q.   AND DID YOU SEE WHERE SHE GOT THAT BUCK KNIFE FROM?

27      A.   SHE TOOK IT SOMEWHERE OFF OF HER PERSON.

28      Q.   WHAT, IF ANYTHING, DID YOU DO WITH THE BUCK KNIFE?

A.    I OPENED THE BUCK KNIFE AND I ATTEMPTED TO CUT OFF THE CLOTHES, BUT THE KNIFE WAS SO DULL, I COULDN'T DO IT, SO WE WOUND UP JUST TEARING THE CLOTHES OFF.

Q.    AFTER YOU FINISHED USING THE BUCK KNIFE, WHAT DID YOU DO WITH IT?

A.    WELL, I DIDN'T -- I WASN'T SURE WHO WAS INVOLVED, SO, AT THAT POINT WHAT I DID, I DIDN'T WANT THE KNIFE JUST LAYING THERE ON THE GROUND, SO I TOOK IT AND I HANDED IT -- IN FACT, I PLACED IT UP ON TOP OF A COUNTER.  WE WERE RIGHT NEXT TO THE COUNTER WHERE THE CASH REGISTER WAS LOCATED.

THE COURT:  ARE THE PHOTOS UP THERE?

THE WITNESS:  THE PHOTOS ARE UP HERE, YES.

BY MR. DAVIDSON:

Q.    SERGEANT CHACON, I WOULD FIRST LIKE TO SHOW YOU WHAT'S BEEN MARKED AS PEOPLE'S 7 FOR IDENTIFICATION, AND ASK YOU, DO YOU RECOGNIZE WHAT'S DEPICTED ON THAT PHOTOGRAPH?

A.    YES, THIS IS A PICTURE OF A YOUNG MAN THAT HAD BEEN SHOT.

Q.    AND SHOWING YOU AGAIN, I LIKE TO SHOW YOU PEOPLE'S 9 FOR IDENTIFICATION, DO YOU RECOGNIZE WHAT'S DEPICTED ON THAT PHOTOGRAPH?

A.    THAT'S THE BUCK KNIFE THAT I PLACED UP ON THE COUNTER.

Q.    DID YOU RENDER ANY TYPE OF FIRST AID YOURSELF TO THE PERSON WHO WAS ON THE FLOOR?

A.    NO, SIR, AS I WAS CUTTING THE CLOTHES OFF OF THE YOUNG MAN, OR RIPPING THE CLOTHES OFF OF THE YOUNG MAN, THE FEMALE SECURITY GUARD WAS CHECKING FOR VITALS AROUND THE NECK

24

AREA, SHE SAID, "NO PULSE." AT THAT POINT, I NOTICED THAT HE
HAD STOPPED BREATHING WHILE I WAS THERE. TWO MEN HAD APPROACHED
DURING THAT TIME AND SAID THAT THEY HAD SOME KIND OF MEDICAL
TRAINING, AND THAT THEY COULD ASSIST WITH CPR AND
MOUTH-TO-MOUTH. WHEN THE FEMALE SECURITY GUARD SAID THERE WERE
NO VITALS, AND HE OBVIOUSLY HAD STOPPED BREATHING, THEN I ASKED
THEM TO GO AHEAD AND PROCEED WITH MOUTH-TO-MOUTH AND CPR.

    Q.    WHAT WAS THE NEXT THING THAT HAPPENED AFTER THAT?

    A.    I BELIEVE NATIONAL CITY P.D. ARRIVED AT THAT TIME
WHILE THEY WERE WORKING ON HIM.

    MR. DAVIDSON:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

    THE COURT:  CROSS-EXAMINATION.

    MR. SIDEMAN:  THANK YOU.


                    CROSS-EXAMINATION

BY MR. SIDEMAN:

    Q.    OFFICER CHACON, HOW LONG HAD YOU BEEN IN THE MALL
BEFORE YOU HEARD THE SHOTS?

    A.    SINCE APPROXIMATELY 2 P.M., SIR.

    Q.    AND ABOUT WHAT TIME WAS IT WHEN YOU HEARD THE
SHOTS?

    A.    IT WAS AT APPROXIMATELY 1645, ACCORDING TO MY
REPORT.

    Q.    AND THE YOUNG MAN THAT YOU FOUND ON THE FLOOR AT
CLAIRE'S BOTIQUE, HAD YOU SEEN HIM EARLIER IN THE MALL, TO YOUR
KNOWLEDGE?

    A.    NOT TO MY KNOWLEDGE.

    Q.    DID THE YOUNG MAN THAT YOU FOUND ON THE FLOOR OF

25

CLAIRE'S BOTIQUE, DID HE HAVE A HAT ON AT THE TIME YOU FOUND
HIM?

    A.   NO, HE DIDN'T.

    Q.   WAS THERE A HAT ANYWHERE ADJACENT TO THE BODY?

    A.   NONE THAT I RECALL.

    Q.   DID YOU SEE ANYBODY, AS YOU APPROACHED CLAIRE'S
BOTIQUE, DID YOU SEE ANYBODY RUNNING AWAY?

    A.   EVERYBODY WAS RUNNING AWAY.

    Q.   A LOT OF PEOPLE WERE RUNNING AWAY?

    A.   YES, SIR.

    MR. SIDEMAN:  NO FURTHER QUESTIONS.

    THE COURT:  ANY REDIRECT?

    MR. DAVIDSON:  NO REDIRECT.

    THE COURT:  ANY OBJECTION FROM THE DEFENSE TO THIS
WITNESS BEING EXCUSED?

    MR. SIDEMAN:  NO, YOUR HONOR.

    THE COURT:  PEOPLE?

    MR. DAVIDSON:  NO, YOUR HONOR.

    THE COURT:  ALL RIGHT.  THANK YOU, OFFICER CHACON, YOU
ARE EXCUSED.  THANK YOU FOR TESTIFYING.  NEXT WITNESS.

    MR. DAVIDSON:  YES.  YOUR HONOR, AT THIS TIME I'LL CALL
KENNETH CORROS TO THE STAND.


                    KENNETH CORROS

    CALLED AS A WITNESS BY AND ON BEHALF OF THE PEOPLE,

    HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:




/ / / / /

26

DIRECT EXAMINATION

BY MR. DAVIDSON:

        Q.    GOOD MORNING.  IF YOU WOULD, PLEASE STATE YOUR FULL
NAME AND SPELL BOTH YOUR FIRST NAME AND YOUR LAST NAME.

        A.    KENNETH CORROS, K-E-N-N-E-T-H, C-O-R-R-O-S.

        Q.    HOW OLD ARE YOU KENNETH?

        A.    18.

        Q.    WHEN -- DID YOU JUST TURN 18?

        A.    27TH OF FEBRUARY.

        Q.    AND KENNETH, ARE YOU ACQUAINTED WITH OR DO YOU KNOW
A PERSON BY THE NAME OF GERARDO SOLIVEN, LAST NAME IS SPELLED
S-O-L-I-V-E-N?

        A.    V-A-N?  YEAH.  YES.

        Q.    AND IS HE ALSO A JR., GERARDO SOLIVEN, JR.?

        A.    YES.

        Q.    AND I'D LIKE TO DIRECT YOUR ATTENTION TO THE DATE
OF FEBRUARY 28TH, 1993, WERE YOU WITH GERARDO SOLIVEN, JR. ON
THAT DAY?

        A.    YES.

        Q.    WHAT TIME DID YOU FIRST MEET UP WITH GERARDO THAT
DAY?

        A.    ANY TIME BETWEEN 4 AND 4:10.

        Q.    BETWEEN 4 AND 4:10?

        A.    YES.

        Q.    IS THAT IN THE AFTERNOON?

        A.    YES.

        Q.    WHERE WERE YOU WHEN YOU FIRST MET UP WITH GERARDO
SOLIVEN?

1    A.    AT MY HOUSE.

2    Q.    AND WAS THERE A PARTICULAR REASON WHY HE CAME TO

3    YOUR HOUSE?

4    A.    YES.

5    Q.    AND WHAT WAS THAT?

6    A.    PICK ME UP TO GO TO THE MALL.

7    Q.    AND WHAT MALL ARE YOU REFERRING TO?

8    A.    PLAZA BONITA.

9    Q.    AND HOW FAR IS PLAZA BONITA MALL FROM YOUR

10   RESIDENCE IN TERMS OF BLOCKS?

11   A.    ABOUT TEN-MINUTE WALK.

12   Q.    AND WHEN GERARDO SOLIVEN CAME TO YOUR HOUSE THAT

13   AFTERNOON, WAS HE ALONE OR WAS HE WITH SOMEONE ELSE?

14   A.    HE CAME TO MY DOOR BY HIMSELF, BUT HIS MOTHER AND

15   HIS MOTHER'S BOYFRIEND WAITED FOR US OUTSIDE.

16   Q.    IF YOU WOULD, YOU ARE GOING TO HAVE TO SPEAK INTO

17   THE MICROPHONE SO EVERYONE CAN HEAR YOU.  AND IF YOU WOULD,

18   COULD YOU PLEASE REPEAT YOUR ANSWER.

19         WHO WAS HE WITH AT THAT TIME, WHEN HE CAME TO YOUR

20   RESIDENCE?

21   A.    HE CAME TO MY, TO MY DOOR BY HIMSELF, BUT HIS

22   MOTHER AND HIS MOTHER'S BOYFRIEND WAS OUTSIDE WAITING FOR US.

23   Q.    AND DID YOU LEAVE YOUR RESIDENCE WITH GERARDO AT

24   THAT TIME?

25   A.    YES.

26   Q.    AND WHERE DID YOU GO?

27   A.    TO THE CAR.

28   Q.    ONCE YOU GOT IN THE CAR, WHAT WAS THE NEXT THING

1    THAT HAPPENED?

2        A.    WENT DOWN THE HILL AND GOT DROPPED OFF AT THE

3    CORNER.

4        Q.    AND WHEN YOU SAY "THE CORNER," ARE YOU REFERRING TO

5    A CORNER NEARBY PLAZA BONITA MALL?

6        A.    YES.

7        Q.    AFTER YOU WERE DROPPED OFF AT THE CORNER -- STRIKE

8    THAT.

9              APPROXIMATELY WHAT TIME WAS IT WHEN YOU WERE

10   DROPPED OFF AT THE CORNER BY THE PLAZA BONITA MALL?

11       A.    I DON'T KNOW, 4, PROBABLY AROUND 4:08, AROUND

12   THERE.

13       Q.    A LITTLE BIT AFTER 4 O'CLOCK?

14       A.    YEAH.  YES.

15       Q.    AFTER YOU WERE DROPPED OFF AT THE CORNER BY THE

16   PLAZA BONITA MALL, WHAT, IF ANYTHING, DID YOU AND GERARDO DO

17   THEN?

18       A.    WALKED.

19       Q.    AND WHERE DID YOU WALK TO?  YOU ARE GOING TO HAVE

20   TO SPEAK IN THE MICROPHONE, PLEASE.

21       A.    ROBINSON'S MAY.

22       Q.    ROBINSON'S MAY COMPANY LOCATED AT PLAZA BONITA

23   MALL?

24       A.    YES.

25       Q.    AND ONCE YOU GOT TO ROBINSON'S MAY COMPANY, WHAT,

26   IF ANYTHING, OCCURRED?  WHAT DID YOU DO AT THAT TIME?

27       A.    WENT TO THE BATHROOM UPSTAIRS.

28       Q.    AND UPSTAIRS IN PLAZA BONITA MALL?

A.    YES. YES.

Q.    BOTH YOU AND GERARDO WENT TO THE BATHROOM AT THAT TIME?

A.    YES.

Q.    WHAT WAS THE NEXT THING THAT HAPPENED?

A.    WALKED OUT AND STARTED WALKING.

Q.    WAS THIS BATHROOM LOCATED IN THE ROBINSON'S MAY COMPANY STORE?

A.    YES.

Q.    AFTER YOU WALKED OUT OF THE BATHROOM, WHERE DID YOU GO?

A.    TO THE ARCADE.  WALKING TOWARDS THE ARCADE.

Q.    AND IS THERE AN ARCADE INSIDE THE PLAZA BONITA MALL KNOWN AS THE TILT, T-I-L-T?

A.    YES.

Q.    AND IS THAT THE ARCADE THAT YOU WERE WALKING TOWARDS?

A.    YES.

Q.    AND WAS THAT JUST YOU AND GERARDO AT THAT TIME?

A.    YES.

Q.    AND WHILE YOU WERE ON YOUR WAY TO THE ARCADE, DID ANYTHING UNUSUAL HAPPEN?

A.    YES.

Q.    FIRST LET ME ASK YOU, HOW FAR IS THE TILT ARCADE FROM ROBINSON'S MAY COMPANY IN TERMS OF DISTANCE INSIDE THE MALL?  IS IT AT THE SAME END OF THE MALL AS ROBINSON'S MAY COMPANY?

A.    NO.

30

Q.    WHERE IS IT LOCATED, IF YOU COULD DESCRIBE IT?

A.    TOWARDS THE OTHER END OF THE MALL.  TOWARDS LIKE, RIGHT BY MONTGOMERY WARDS.

Q.    WOULD THAT BE TOWARDS THE FRONT OF THE MALL, OR THE FRONT ENTRANCE TO THE MALL?

A.    I DON'T KNOW.

Q.    OKAY.  AS YOU WERE WALKING TOWARDS THE TILT ARCADE, DID SOMETHING UNUSUAL TAKE PLACE?

A.    YES.

Q.    AND WHAT WAS THAT?

A.    THERE WAS I GUESS A STARE DOWN.

Q.    YOU SAID YOU GUESS A STARE DOWN.  LET ME ASK YOU THIS, WERE YOU -- THE MALL HAS TWO LEVELS; IS THAT CORRECT?

A.    YES.

Q.    AND WERE YOU ON THE UPPER LEVEL OF THE MALL?

A.    YES.

Q.    AND DO YOU KNOW AN AREA INSIDE THE MALL KNOWN AS JARMAN'S SHOES?

A.    YEAH.

Q.    AND AS YOU WERE WALKING TO THE ARCADE, AT SOME POINT DID YOU LOOK DOWN TOWARDS THE JARMAN'S SHOE STORE?

MR. SIDEMAN:  I'M GOING TO OBJECT, THAT'S LEADING.

THE COURT:  WELL, IT'S SOMEWHAT LEADING, BUT I DON'T THINK IT'S UNDULY SUGGESTIVE.  OVERRULED.  YOU MAY ANSWER.

THE WITNESS:  YES.

BY MR. DAVIDSON:

Q.    AND AT THE TIME YOU LOOKED DOWN TOWARDS THAT SHOE STORE, WHAT, IF ANYTHING, DID YOU OBSERVE?

DONNA T. GEBHART, OFFICIAL COURT REPORTER

31

A.    PEOPLE LOOKING AT US.

Q.    HOW MANY PEOPLE DID YOU SEE AT THAT TIME?

A.    THREE.

Q.    AND COULD YOU DESCRIBE THE THREE PEOPLE THAT YOU SAW?

A.    ONE WAS TALL AND SKINNY.

Q.    WHAT TYPE OF CLOTHING WAS THE TALL AND SKINNY PERSON WEARING?

A.    I CAN'T REMEMBER.

Q.    DID THE TALL AND SKINNY PERSON HAVE ANY TYPE OF CLOTHES ON, I MEAN, ANY TYPE OF HAT OR APPAREL FOR HIS HEAD?

A.    YEAH, HE HAD A HAT ON.

Q.    WHAT TYPE OF HAT?

A.    I CAN'T REMEMBER.

Q.    WHAT COLOR WAS THE HAT?

A.    CAN'T REMEMBER THAT EITHER.

Q.    NOW, COULD YOU DESCRIBE THE OTHER TWO INDIVIDUALS?

A.    OTHER ONE WAS SHORT.

Q.    AND WHAT TYPE OF CLOTHING DID THE SHORT PERSON HAVE ON?

A.    T-SHIRT.

Q.    WHAT COLOR T-SHIRT?

A.    WHITE.

Q.    COULD YOU SEE THE COLOR OF THE SHORT PERSON'S PANTS?

A.    BLACK JEANS.

Q.    AND COULD YOU DESCRIBE THE THIRD PERSON YOU SAW?

A.    LIKE, I DON'T KNOW, CHUBBY, I GUESS, OR CHUBBY.

32

Q.    WITH RESPECT TO THOSE THREE INDIVIDUALS, COULD YOU TELL WHAT RACE THEY WERE?

A.    HISPANIC.

Q.    NOW, AS YOU LOOKED TOWARDS THE THREE INDIVIDUALS, DID SOMETHING UNUSUAL HAPPEN?

A.    YES.

Q.    AND WHAT WAS THAT?

A.    WE WERE BOTH STARING AT EACH OTHER.

Q.    WHEN YOU SAY WE WERE BOTH STARING AT EACH OTHER, WERE YOU STARING AT THESE THREE INDIVIDUALS?

A.    WELL, WELL, YEAH.

Q.    COULD YOU SEE WHAT GERARDO WAS DOING AT THAT TIME?

A.    YES.

Q.    WHAT, IF ANYTHING, WAS HE DOING?

A.    STARING, TOO.

Q.    NOW, WERE YOU WALKING AT THE TIME YOU WERE LOOKING AT THE THREE INDIVIDUALS IN FRONT OF THE JARMAN'S SHOES?

A.    VERY SLOWLY, YES.

Q.    WHAT DID THE THREE INDIVIDUALS WHO WERE IN FRONT OF JARMAN'S SHOES APPEAR TO BE DOING AS YOU WERE LOOKING AT THEM?

A.    LOOKING BACK.

Q.    WERE THEY WALKING OR WERE THEY IN A STATIONARY POSITION?

A.    STATIONARY POSITION.

Q.    AS THEY WERE LOOKING BACK UP TO YOU, WERE THERE ANY TYPE OF WORDS EXCHANGED AT ALL?

A.    NO.

Q.    DID YOU SEE ANYBODY MAKE ANY TYPE OF HAND